**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| COPAN ITALIA S.P.A., and COPAN DIAGNOSTICS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PURITAN MEDICAL PRODUCTS COMPANY LLC, PURITAN DIAGNOSTICS LLC, HARDWOOD PRODUCTS COMPANY LP, AND HARDWOOD PRODUCTS COMPANY LLC, <br><br> Defendants. | C.A. No. 1:18-cv-218-JDL <br><br> JURY TRIAL DEMANDED |

**<u>DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER</u>**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................ 1

II.   FACTUAL BACKGROUND .......................................................................................... 1

    A.    Procedural history ............................................................................................... 1

    B.    Developments that took place during the stay. ................................................... 2

III.  LEGAL STANDARDS.................................................................................................... 3

IV.   ARGUMENT .................................................................................................................. 4

    A.    Copan has failed to establish good cause for an expansive reopening of discovery. ............... 4

        1.    Copan's proposal will cause Puritan to incur unnecessary expenses, waste judicial resources, and is unlikely to provide non-cumulative information. .............................. 5

        2.    Copan's proposal would substantively prejudice Puritan. ........................................... 7

        3.    Copan's proposed schedule is unrealistic. ................................................................... 8

    B.    Copan's new discovery is unreasonably cumulative and not proportional. ........................... 9

V.    CONCLUSION ............................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akeva, LLC v. Mizuno Corp.*,
212 F.R.D. 306 (M.D.N.C. 2002) ..............................................................................................8

*Cabana v. Forcier*,
200 F.R.D. 9 (D. Mass. 2001) ..............................................................................................4, 6

*Cady v. Cumberland Cty. Jail*,
No. 2:10-CV-512, 2012 WL 3887106 (D. Me. Sept. 7, 2012) ....................................................4

*Est. of Cape v. United States*,
No. 11-C-0357, 2013 WL 4522933 (E.D. Wis. Aug. 27, 2013)...................................................8

*Carando Gourmet Frozen Foods Corp. v. Axis Automation, LLC*,
No. 3:17-CV-30164, 2019 WL 5394175 (D. Mass. Oct. 22, 2019) .........................................4

*Rhoades v. Camden Nat'l Corp.*,
No. 07-cv-117, 2008 WL 375250 (D. Me. Feb. 11, 2008) .......................................................4

*Steir v. Girl Scouts of USA*,
383 F.3d 7 (1st Cir. 2004)......................................................................................................4, 5

*Union Lab. Life Ins. Co. v. O'Neill*,
No. CV 15-152S, 2017 WL 11368357 (D.R.I. July 17, 2017) .............................................4, 9

*United States v. 14.3 Acres of Land*,
No. 07CV886-AJB NLS, 2011 WL 2414348 (S.D. Cal. June 10, 2011) .................................8

*Vineberg v. Bissonnette*,
548 F.3d 50 (1st Cir. 2008)....................................................................................................3, 4

*Williamson v. Horizon Lines LLC*,
248 F.R.D. 79 (D. Me. 2008)..................................................................................................3, 9

**Statutes**

Defense Production Act of 1950, 50 U.S.C. § 4531, *et seq.*.....................................................2, 6

**Rules**

Fed. R. Civ. P. 1 ....................................................................................................................3, 9

Fed. R. Civ. P. 16 ................................................................................................................4

Fed. R. Civ. P. 26 .........................................................................................................8, 10

## I.    **INTRODUCTION**

Copan sued Puritan more than three years ago. This case is ready for expert depositions, dispositive motions, and a jury trial. To reach this point, the parties have endured a long, twice-extended discovery phase with more than 20 depositions (some in Italy) and 276,833 pages of documents. Now, after years of litigation and an extensive—and costly—discovery phase, Copan wants to reopen fact and expert discovery to pursue inquiries.[1] There's no good cause for this request, and Copan wants new discovery as an excuse to correct deficiencies in its technical expert reports. Allowing new discovery on technical issues at this late date would be very prejudicial to Puritan because it would give Copan an expert do-over, with the benefit of having seen Puritan's rebuttal reports. And Copan's new discovery would add delay and expenses for both parties, plus new rounds of reports from technical experts.

Discovery should be limited. The parties agree to supplement damages discovery and licenses for the stay period and to supplement damages expert reports to account for this new information. This type of damages supplementation is common in patent cases and will have only a small effect on the schedule and the parties' resources. The Court should deny Copan's proposal because it seeks to broadly reopen fact and expert discovery, which is disproportional and unduly burdensome.

## II.    **FACTUAL BACKGROUND**

### A.    **Procedural history**

Fact discovery opened on September 4, 2018 and closed on December 18, 2019 (after two extensions). Copan served 212 document requests, 25 interrogatories (with dozens of subparts), 22 requests for admission, 1,275 "authentication" requests for admission, and took 9 depositions (including a 41-topic corporate deposition). To comply with Copan's requests, Puritan collected terabytes of data, spent thousands of hours reviewing documents, and produced 91,445 pages.

After fact discovery closed, the parties exchanged 13 expert reports in two rounds. Copan's

---

[1] For the Court's convenience, a summary table showing the Parties' competing proposals is provided as Exhibit 1.

1

experts include a textile engineer, two microbiologists, and a damages expert. Puritan's experts include a textile engineer, a microbiologist, an electrostatics engineer, and a damages expert. Combined, these experts generated 3,281 pages (including exhibits) in their reports. The technical disputes about infringement and validity are crystalized. But because Copan seeks damages for past activities and future activities (until the asserted patents expire in a few years), potential damages, if any, are continuing.

### B.    Developments that took place during the stay.

The Court stayed the case during the COVID-19 pandemic. *See* ECF No. 168. At the time, discovery was closed and the parties were scheduling expert depositions, with a trial-ready date of July 7, 2020. *See* ECF No. 159. During the stay, the parties focused on manufacturing testing materials. The federal government invoked the Defense Production Act, and ordered Puritan to increase production of testing materials. As noted in the motion to stay, Puritan had announced that it would open a factory in Pittsfield, Maine to increase production of COVID-19 testing swabs. *See* ECF No. 167 at 2.[2] This Pittsfield factory is dubbed "P2" (i.e., Puritan's second plant) and has been used to manufacture foam swabs since 2020. *See* Dixon Decl., ¶¶ 2–3. This factory, P2, has never been used to manufacture flocked swabs (the accused products in this case). *See id.*, ¶ 3. Bath Iron Works ("BIW") built some P2 machinery used to package unaccused *foam* swabs at P2. *See id.*[3]

To comply with its obligations under the Defense Production Act, Puritan expanded its presence in Pittsfield in 2021 by opening a third facility (dubbed "P3," as Puritan's third plant). *See id.*, ¶ 4. Unlike P2, the P3 factory is used to manufacture the accused flocked swabs. *See id.* (noting that BIW did not provide manufacturing equipment used to make flocked swabs at P3). The manufacturing lines in place at P3 were built using technical drawings of the equipment at Puritan's original factory in Guilford, Maine

---

[2] *See* www.puritanmedproducts.com/news-and-events/news/post/Press-Release-Puritan-COVID-Swab-New-Factory. A related Department of Defense press release is available at www.defense.gov/Newsroom/Releases/Release/Article/2170355/dod-details-75-million-defense-production-act-title-3-puritan-contract/.

[3] Puritan's press release also notes BIW's role as a contractor for the P2 site. Still, Copan's counsel identified BIW as a potential target for subpoenas if discovery re-opens.

(dubbed "P1"). *See id.* So the flocked swab manufacturing lines at P3 are substantially identical to the flocked swab manufacturing at P1. *See id.*, ¶ 5. Moreover, the fibers, fiber cutting, fiber treatment, and adhesive used to produce flocked swabs at P3 have the same specifications as the fibers, fiber cutting, fiber treatment, and adhesive used to produce flocked swabs at P1. *See id.*, ¶¶ 6–8. Accordingly, flocked swabs made at P3 are indistinguishable from flocked swabs made at P1. *See id.*, ¶ 9.

Puritan makes many different flocked swabs. Puritan already produced 16 flocked swab models made at P1. The parties agreed that these 16 swabs are representative of all Puritan flocked swabs for evaluating infringement.[4] Copan's experts analyzed these representative swabs. So did Puritan's experts.

Finally, Puritan plans a fourth plant in Tennessee. This plant is not operational and no flocked swabs have been manufactured (or are planned) at this facility. *See id.*, ¶ 10.

## III.    <u>LEGAL STANDARDS</u>

The Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, ***speedy, and inexpensive*** determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added). This north star should not be ignored here.

"Trial courts have a responsibility to manage their dockets efficiently, and a necessary corollary of that proposition is that litigants are entitled to a reasonable period of time within which to conduct discovery, not a limitless period." *Vineberg v. Bissonnette*, 548 F.3d 50, 55 (1st Cir. 2008). "Reopening discovery is a matter 'for the informed discretion of the trial judge, and the breadth of that discretion in managing pre-trial mechanics and discovery is very great.'" *Williamson v. Horizon Lines LLC*, 248 F.R.D. 79, 82 (D. Me. 2008) (adopting recommendation to not reopen discovery because of the "potential [to cause] further delay and additional discovery" for case that was close to trial) (*id.* at 81)). Courts have

---

[4] Agreement was confirmed in Copan's expert reports. *See, e.g.*, Opening Expert Report of Stephen Michielsen, ¶ 8 ("I did not test all of these [Puritan swab] models [listed in Appendix A] after being informed by [Copan's] counsel that Puritan produced only representative products."), ¶ 84 ("[I]t is my understanding that each party produced what it characterized as representative samples of all of their flocked swab products."), App'x A ("It is my understanding that Puritan only produced representative samples of 16 of its products and that, as such, a demonstration of infringement for these products demonstrates infringement of all of Puritan's flocked swab products.").

complete discretion in issuing discovery deadlines, which "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). In evaluating good cause, courts consider: (1) the diligence of the moving party and (2) whether the opposing party would be prejudiced by the modification. *See Steir v. Girl Scouts of USA*, 383 F.3d 7, 12 (1st Cir. 2004). Courts have used *Steir*'s "good cause" standard when considering whether to reopen discovery. "[N]either party has asked the Court to reopen fact discovery; in any event, if [defendant] made such a request, it would not be lightly granted especially in light of the prejudice more delay would inflict on [plaintiff]." *Union Lab. Life Ins. Co. v. O'Neill*, No. CV 15-152S, 2017 WL 11368357, at *2 (D.R.I. July 17, 2017) (citing *Steir*). The "good cause" standard is not satisfied where the requested discovery is duplicative of discovery already obtained by the moving party. *See Cabana v. Forcier*, 200 F.R.D. 9, 14–15 (D. Mass. 2001).

Courts regularly deny motions to reopen discovery because of the associated delay and expense. *See, e.g.*, *Cady v. Cumberland Cty. Jail*, No. 2:10-CV-512, 2012 WL 3887106 (D. Me. Sept. 7, 2012) (no good cause because amendment would require reopening expert discovery); *Carando Gourmet Frozen Foods Corp. v. Axis Automation, LLC*, No. 3:17-CV-30164, 2019 WL 5394175 (D. Mass. Oct. 22, 2019) ("Axis argues that, after almost two years of litigation, further delays to permit the additional discovery necessary to defend against these new claims would be prejudicial and expensive, including any additional prejudgment interest. . . . Axis would be prejudiced if discovery were re-opened." (citing *Rhoades v. Camden Nat'l Corp.*, No. 07-cv-117, 2008 WL 375250 (D. Me. Feb. 11, 2008)).

Finally, the First Circuit affirmed the denial of a motion to reopen discovery because discovery is not "limitless" and that the request "threatened to delay the proceedings." *Vineberg*, 548 F.3d at 55. The First Circuit also observed that the defendant's failure "to point to any relevant leads that she might have obtained had the district court reopened discovery" favored the district court's ruling. *Id*.

IV.    **ARGUMENT**

A.    **Copan has failed to establish good cause for an expansive reopening of discovery.**

Courts tasked with deciding whether good cause exists for reopening discovery must consider

4

the diligence of the party seeking the amendment and whether the opposing party would be prejudiced by the modification. *See Steir*, 383 F.3d at 12 (motion to modify scheduling order brought after close of discovery is prejudicial if it requires reopening of discovery, delay of trial, and imposition of additional costs on nonmoving party). Neither is dispositive, and Puritan would be prejudiced by Copan's proposal.

### 1. Copan's proposal will cause Puritan to incur unnecessary expenses, waste judicial resources, and is unlikely to provide non-cumulative information.

Copan's proposal allows an expansive reopening of fact discovery, followed by free supplementation of all expert reports. Although the full scope of what Copan will seek in discovery is unclear, Copan has stated that it intends to seek discovery about Puritan's Pittsfield factories (i.e., P2 and P3); a future Puritan factory in Tennessee; and BIW (Copan believes that BIW supplied flocking Puritan's equipment). Copan asserts that this discovery is relevant to explore Puritan's "unique" method for manufacturing flocked swabs—something repeatedly disclosed during fact discovery in 2019 and rejected by Copan's technical expert in 2020.

Copan's recent assertion that Puritan's factories and machines are important discovery is a *complete reversal* from its prior, documented position. Copan must have forgotten telling this Court that it had no interest in the machinery used to make Puritan's flocked swabs: "[T]he design of the machines that are in Puritan's factory. We don't want those. We never did. . . . we don't want them." Hr'g Tr. at 23:1–16 (Mar. 18, 2019). The point was repeated at least half a dozen times.

In view of these prior assertions, Copan's sudden interest now in the machinery at Puritan's P2 and P3 factories is merely a pretext to conduct a fishing expedition and to attempt to justify Copan's request to broadly reopen fact discovery. Relatedly, Copan also wants to supplement *all* expert reports (including technical expert reports), in view of new fact discovery.[5]

---

[5] Copan wants fact discovery to get new evidence that Copan considers relevant to damages (e.g., sales data, new agreements, and new licenses) based on post-stay activity. Puritan agrees to supplementing damages discovery and licenses, but not more. And Puritan does not concede that Copan's licenses—signed long after the first accused sale— are relevant to damages. But narrow damages supplementation is proper here.

As explained above, Puritan built P2 and P3 to make more swabs, as ordered under the Defense Production Act. But P2 has ***never*** been used to manufacture flocked swabs. *See* Dixon Decl., ¶ 3. In Pittsfield, only P3 manufactures flocked swabs. *See id.*, ¶ 4. And the flocking equipment at P3 is a copy of P1's technology, with the fibers, fiber cutting, and fiber treatment used to produce flocked swabs at P3 identical to the fibers, fiber cutting, fiber treatment, and adhesive used to produce flocked swabs at P1. *See id.*, ¶¶ 6–8. Indeed, the fibers used in the two flocked swab plants (P1 and P3) are interchangeable. *See id.*, ¶ 6. Puritan told Copan that there's no real difference in swabs made at P1 or P3, and affirmed the stipulation about the 16 representative products. Undeterred, Copan still wants new discovery that it vociferously rejected as irrelevant before. Courts in this Circuit have denied similar requests for duplicative of discovery already obtained by the moving party. *See Cabana*, 200 F.R.D. at 14–15.

If Copan insists on discovery about P2 and P3, Puritan will incur unnecessary expenses. P2 does not make flocked swabs and Copan has no legitimate reason to seek discovery about third-party BIW, a contractor for P2. The probative value would be zero, and substantially outweighed by the burden to Puritan. Discovery into P3 is similarly unnecessary because: (1) the flocked swab manufacturing lines at P3 replicate the manufacturing lines at P1 (which was the subject of extensive discovery); and (2) P1 and P3 share flock-processing equipment, adhesive, and fiber.

Puritan produced samples of 16 representative swab products made at P1 during fact discovery, and those samples are indistinguishable from swabs made at P3. *See id.*, ¶ 9. The parties agreed that 16 samples are representative of the accused Puritan products. Thus, the P1 and P3 swabs rise and fall together for infringement. And the existing expert analyses of Puritan's representative swabs by technical experts are equally applicable to flocked swabs manufactured at P3. In view of this, Copan's request for discovery about P3 is cumulative or duplicative of prior discovery about P1 and representative swabs made at P1. Any additional probative value of discovery into P3 is outweighed by Puritan's expenses related to the collection of such information and the inevitable discovery disputes.

Copan's request for discovery into the Tennessee facility is also meritless. This facility is still in the early stages of development and no swabs—flocked or otherwise—have been made there. *See id.*, ¶ 10. Current plans allocate no flocked swab manufacturing there. Copan has no legitimate basis for seeking discovery into this facility, and instead wants authorization for a fishing expedition. If Copan's request is granted, Puritan will incur expenses collecting information about this facility and engaging in motion practice related to the inevitable discovery disputes.

Copan is not forced trust without verification—it can test samples made at P3 (Puritan can produce samples). If Copan can show differences between the 16 representative samples and new P3-made flocked swabs relevant to infringement, then it can justify new discovery. "Trust but verify" is not a magical incantation that reopens fact discovery at will.

Copan's proposal also reopens expert discovery about technical issues, creating another round of opening and rebuttal reports. This proposal sets no meaningful limitation on these updates, other than to say that the focus will be on what happened after the stay. Puritan will incur substantial expenses commissioning six updated opening and rebuttal technical reports to redo already-crystalized issues.

### 2.    Copan's proposal would substantively prejudice Puritan.

In additional to the expense of additional discovery, Puritan will also suffer prejudice if Copan's request is granted. The experts produced their opening reports on technical issues related to infringement and invalidity in February 2020, and rebuttal reports in May 2020 (shortly before the stay). None of the experts raised concerns suggesting that their analyses were incomplete or hamstrung by any limited discovery on the manufacturing methods and techniques used to make the accused products. Indeed, these reports amount to several hundred pages of analysis and each was prepared based on full discovery. The parties presented competing theories about infringement and invalidity, and their experts have offered rebuttals based on a complete (and very expensive) discovery record. Today, the technical disputes are crystalized.

Copan's proposal would upend the status quo by allowing technical experts to freely supplement their opening and rebuttal reports. In reality, Copan wants a do-over to fix weaknesses and errors in its experts' analyses, using the new factories as an excuse. But it would be highly prejudicial and unfair if Copan's technical experts get to modify their expert reports after reviewing Puritan's rebuttal reports. The scheduling order always had an agreed-to end to expert reports after the second round. Copan never asked for reply expert reports and should not get them now.

Courts interpreting requests to supplement expert reports have consistently held that an expert may not "fix" analytical or methodological flaws with a "supplement." *See Est. of Cape v. United States*, No. 11-CV-0357, 2013 WL 4522933, at *5 (E.D. Wis. Aug. 27, 2013) ("[S]upplementation is not properly used to remedy defects in an expert's report or testimony after the weaknesses have been revealed."); *United States v. 14.3 Acres of Land*, No. 07-CV-886, 2011 WL 2414348, at *4 (S.D. Cal. June 10, 2011) ("[A] party may not rely on Rule 26(e)(1) as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report." (citations omitted)). The Rules simply do not provide for expert do-overs based on the criticisms of opposing parties or differing approaches of opposing experts. *See Akeva, LLC v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002). Accordingly, Puritan will be substantively prejudiced by Copan's wide-ranging discovery.

### 3.    Copan's proposed schedule is unrealistic.

This litigation has been pending for over three years. The parties have had ample opportunities to obtain discovery from each other and third parties. Indeed, fact discovery remained open for over a year. The parties took more than 20 depositions and produced nearly 300,000 pages of documents. In expert discovery, the parties exchanged 13 voluminous expert reports. Discovery costs for this case have been staggering, particularly in view of the simplicity (and age) of the technology underlying the asserted patents. When the case was stayed, fact discovery was long closed and the parties were scheduling expert depositions and preparing dispositive motions, with a trial-ready date less than 8 weeks away. The parties

were essentially down to the last few yards of a marathon.

Copan's proposed schedule will rewind this case back to fact discovery in 2019, creating extra expenses and delay, prejudicing Puritan. *See Williamson*, 248 F.R.D. at 81 (adopting recommendation to not reopen discovery because of the "potential [to cause] further delay and additional discovery" close to trial); *Union*, 2017 WL 11368357, at *2 (re-opening discovery was prejudicial given the delay); Fed. R. Civ. P. 1. Copan's lawsuits here and abroad have placed a cloud over Puritan. Puritan's ability to make long-term strategic decisions about flocked swabs remains limited while this dispute is pending. In other words, delays hurt Puritan.

Copan's proposal—with compressed fact and expert discovery—is unrealistic. Discovery has been contentious, with multiple disputes requiring judicial involvement. More discovery disputes will arise if Copan gets an expansive reopening of discovery. Thus, Copan's proposed dates for the completion of fact and expert discovery will likely spill over by several weeks, if not months.

Copan proposes giving itself ***months*** (from now through January 28, 2022) to update all 6 of its expert reports. Puritan, by contrast, would get just ***14 days*** to review and rebut these new reports. And Copan's suggestion that 8 expert depositions can happen in 32 days is also unrealistic. In view of these issues, Copan's schedule will require further extensions (and delays).

Puritan's proposed schedule may initially appear to result in similar trial-ready dates if the schedules are compared side-by-side. But Puritan's schedule uses more realistic deadlines for intervening milestones (e.g., 53 days to complete expert depositions), which are unlikely to require an extension. Copan's proposal, by comparison, is unrealistic on its face.

**B.      Copan's new discovery is unreasonably cumulative and not proportional.**

Even if Copan could show good cause to seek new discovery about the P2 and P3 factories, or about BIW's role, this Court may deny such discovery based on pragmatic concerns. Copan repeatedly told this Court that it was not interested in any discovery about Puritan's flocking machines: "[T]he

design of the machines that are in Puritan's factory. We don't want those. We never did. . . . we don't want them." Hr'g Tr. at 23:11–16 (Mar. 18, 2019).

Even so, Copan received ample discovery about Puritan's flocked swab production equipment and processes used at P1. This includes technical drawings, specifications, illustrations, depositions of multiple Puritan employees (including Todd Dixon, who designed Puritan's flocking equipment), and third-party depositions and documents from Puritan's fiber supplier, fiber cutter, and fiber processor. It also included samples of 16 representative flocked swab products produced at P1. Puritan stipulated (and Copan acknowledged) that these samples are representative of Puritan's accused swab products.

As explained above, Mr. Dixon's sworn declaration states that P2 does not make flocked swabs. Copan's request for discovery about P2 should be denied because it will yield no relevant evidence and the value of such discovery is outweighed by burden and expense. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii). Copan's related request for third-party discovery from BIW should be denied for the same reasons. *See* Dixon Decl., ¶ 3. BIW discovery would just harass one of Puritan's contractors. Copan is pulling names from press releases to justify a fishing license.

As for discovery about P3, Dixon's declaration confirms that the flocked swab manufacturing lines at this facility replicate the manufacturing lines at P1; and that the flock-processing equipment and fiber used at P3 are identical to those used at P1. *See id.*, ¶¶ 4–9. So there is no reason to believe that the flocked swabs produced at P3 are different from those produced at P1 (and turned over years ago). *See id.*, ¶ 9. It follows that Copan's request for discovery about P3 is cumulative or duplicative of earlier discovery. The benefits of such discovery are minimal and outweighed by the burden to Puritan.

Finally, Copan's request for discovery about the Tennessee facility should be denied, given that this facility is incomplete and is not slated to make flocked swabs. *See id.*, ¶ 10.

## V.    **CONCLUSION**

For these reasons, the Court should adopt Puritan's proposed schedule.

Dated: September 17, 2021                    Respectfully submitted,


/s/ Taniel Anderson
Peter J. Brann
Stacy O. Stitham
David Swetnam-Burland
BRANN & ISAACSON
184 Main Street, 4th Floor
Lewiston, ME 04243-3070
(207) 786-3566
pbrann@brannlaw.com
sstitham@brannlaw.com
dsb@brannlaw.com

James H. Hulme
Janine A. Carlan
Taniel E. Anderson
Kevin R. Pinkney
Gary A. Coad
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000
james.hulme@arentfox.com
taniel.anderson@arentfox.com
janine.carlan@arentfox.com
kevin.pinkney@arentfox.com
gary.coad@arentfox.com

Andrew R. Levin
ARENT FOX LLP
The Prudential Tower
800 Boylston Street, 32nd Floor
Boston, MA 02199
(617) 973-6100
andrew.levin@arentfox.com

*Attorneys for Defendants*

11